GMP:TJS/TAD
F.#2012R0097/NY-NYE-665

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -              12 CR 521 (CBA)

DEVON DANIELS,

          Defendant.

- - - - - - - - - - - - - - - - - - X

## GOVERNMENT'S MOTION PURSUANT TO RULE
## 404(b) OF THE FEDERAL RULES OF EVIDENCE

LORETTA E. LYNCH
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Tyler J. Smith
Tiana A. Demas
Assistant U.S. Attorneys
(Of Counsel)

**PRELIMINARY STATEMENT**

The defendant, Devon Daniels ("Daniels" or "defendant"), an officer of the New York City Police Department ("NYPD"), is charged with four counts of accessing NYPD databases in a manner that was unauthorized or exceeded his authorized access and four counts of making false statements to federal officers.

The government respectfully submits this memorandum of law in support of the government's motion pursuant to Federal Rule of Evidence 404(b) to introduce certain evidence at trial.

First, the government seeks to admit evidence of the close personal relationship between Daniels and Guy Curtis, the individual who requested that Daniels obtain information from the NYPD databases. Second, the government seeks to admit evidence of uncharged instances in which Daniels obtained unauthorized access to NYPD databases.

As explained below, the evidence that the government seeks to introduce at trial is inextricably intertwined with the charged crimes; shows Daniels' absence of mistake in making unauthorized access to the NYPD databases; and explains the nature of the relationship between Daniels and Curtis, who is the co-conspirator in an uncharged conspiracy to access the NYPD databases. In addition, the proposed evidence is admissible to

1

prove the defendant's motive, opportunity, intent, knowledge, and identity.

## STATEMENT OF FACTS

I.   The National Crime Information Center

Pursuant to Congressional authorization, the Federal Bureau of Investigation ("FBI") maintains the National Crime Information Center ("NCIC"), a computer database accessible by federal and state law enforcement authorities.  That database contains information relating to criminal histories, outstanding foreign, federal and state arrest warrants, the suspected terrorist watch list and the national sex offender registry.

New York City maintains electronic database systems known as FINEST and MDT (hereafter, the "NYPD database"), which are designed to give users from qualified law enforcement agencies a single point of access to computerized law enforcement information within and beyond New York State. Qualified state and local law enforcement personnel in New York have access to various forms of information maintained in the NYPD database, including information maintained by the FBI in the NCIC.

The NYPD has NYPD database accounts, which can be accessed by multiple users.  NYPD officers may access the NYPD database website solely by using a unique assigned user identification code, which consists of a combination of the

2

initials of the officer's first and last name and a six digit
NYPD-issued identification number or a text password.  As part
of their academy training, NYPD officers are required to attend
a course on the proper use of the NYPD database and other
confidential databases.

NYPD database users are warned on the website that the
user can only request information related to official police
department business from the system.  Arbitrary inquiries of
individuals that do not relate to official police department
business are prohibited.  Users are further cautioned that the
NYPD database is to be operated only by individuals who have
been issued an identification code or password.  Only the
individual signed onto the database is authorized to search the
database.

II.  <u>Background of the Investigation</u>

Since approximately October 2008, the DEA office in
Wichita, Kansas has been investigating a heroin trafficking
organization.  One of the targets of its investigation is
Jermaine Ward.  In approximately September 2010, the DEA
initiated a wiretap investigation and began intercepting calls
to and from a telephone used by Jermaine Ward (the "Ward
Telephone").  Based on calls intercepted over the Ward
Telephone, the DEA identified Guy Curtis as a heroin supplier
for Jermaine Ward.  Specifically, agents intercepted a

3

conversation between Guy Curtis and Jermaine Ward on October 23, 2010, in which they discussed a heroin shipment to be sent from New York to Wichita for Jermaine Ward.  During this conversation, Guy Curtis was communicating with Jermaine Ward using telephone number (212)920-7712 (the "Curtis Telephone").

On April 12, 2011, DEA agents began intercepting wire and electronic communications over the Curtis Telephone pursuant to an order signed by the Honorable Sterling Johnson, Jr., in this District.  On May 16, 2011, Judge Johnson authorized DEA agents to continue intercepting wire and electronic communications over the Curtis Telephone.  Wire interception ceased on June 14, 2011.  The wire interceptions revealed that Guy Curtis was the leader of "POV City," a violent heroin distribution organization based in the Jamaica section of Queens, New York.  The wire interceptions captured communications relating to drug trafficking and numerous episodes of physical violence involving Curtis' drug trafficking organization.

On July 1, 2011, a grand jury sitting in the Eastern District of New York returned an indictment charging Curtis, a member of his organization named Ishmael Lambus, and five other members of Curtis' organization with conspiring to distribute and possess with intent to distribute 100 grams or more of heroin, in violation of Title 21, United States Code, Section

4

846.  In January 2012, all of the defendants pled guilty to that charge.

III. <u>Daniels' Relationship With Curtis</u>

Since 2007, Devon Daniels has been an officer with the NYPD.  Between June 2007 and June 2011, Daniels was assigned to the 111th precinct located in Queens, New York.  In June 2011, he was re-assigned to a "Viper" room monitoring housing projects.  Wire interceptions and a review of Curtis' telephone indicate that, while acting as a uniformed police officer, Daniels maintained regular contact with Curtis.

The wire interceptions captured communications involving, among other things, Daniels asking Curtis for "any working revolver," for loans of money, and to borrow Curtis' car.  The wire interceptions also captured Curtis asking Daniels how to get "gun shot residue off your hands," and requesting that Daniels "clap a felon" who, according to Curtis, always carried a firearm.  In addition, evidence indicates that Daniels provided Curtis with an NYPD parking plaque for his vehicles. Notably, a search of Curtis' house uncovered Police Benevolent Association ("PBA") Cards, indicating him to be a friend of Daniels and a miniature NYPD badge with Daniels' badge number.

Wire interceptions also revealed that on April 29, 2011, Curtis informed Daniels that one of Curtis' associates, Ishmael Lambus, was being arrested by NYPD.  Daniels, while

5

driving one of Curtis' cars, immediately proceeded to the scene and surveilled the heroin drug arrest of Lambus.  Daniels also identified himself to the arresting officers as an NYPD Officer and inquired about the circumstances of Lambus' arrest.  Wire interceptions indicate that after leaving the scene, Daniels immediately reported the details of Lambus' arrest to Curtis.

During the course of his relationship with Curtis, Daniels also provided Curtis with his bank account information, which was then used to facilitate financial transactions involving drug proceeds.  Specifically, after Daniels first provided his account information to Curtis, Curtis then provided this information to Jermaine Ward, a distributer of Curtis' heroin in Wichita, Kansas.  Ward then wired $3,500 to Daniels' bank account as payment for heroin Curtis provided to Ward. Daniels withdrew the drug proceeds and gave it to Curtis. Daniels also admitted to law enforcement officers that he had previously posted bail on behalf of Curtis in connection with a New Jersey traffic violation.

When requested by Curtis, Daniels also improperly accessed the NYPD databases to perform criminal background checks or to obtain license plate information for Curtis. Daniels then provided the results of his queries to Curtis.  In addition to the four charged occasions that Daniels accessed the

NYPD database at Curtis' request, Daniels also queried the

database at least six other times.   Specifically:

- On or about September 25, 2008, at Curtis' request, Daniels entered the license plate number for one of Curtis' vehicles into the NYPD database;

- On or about July 2, 2009, at Curtis' request, Daniels performed a criminal background check on Kamel Lambus, who is Ismael Lambus' cousin;

- On or about March 9, 2010 Daniels obtained license plate information for Curtis;

- On or about April 23, 2010 and on June 20, 2010, Daniels performed a criminal background checks for Curtis;

- On or about July 22, 2010, Daniels obtained license plate information for Curtis; and

- On or about November 12, 2010, Daniels obtained car registration information for Curtis.

IV.   <u>Daniels' Arrest and False Statements</u>

On May 15, 2012, Daniels was arrested pursuant to an

arrest warrant signed by United States Magistrate Judge Lois

Bloom.   He was taken to DEA headquarters in Manhattan.   Daniels

was advised of his <u>Miranda</u> rights, which he indicated he

understood and waived before speaking to agents.

During the course of his interivew, Daniels indicated

to the agents, in sum and substance, that he has known Guy

Curtis for approximately five years.   Curtis is from Daniels'

neighborhood, and they met at Liberty Park located in Jamaica,

Queens.   Daniels also identified photographs of members of POV

7

City, namely Curtis, Ishmael Lambus and three other individuals. Daniels also informed the agents that he had not been involved in any narcotics transactions.

The agents also questioned Daniels regarding his knowledge of Curtis' livelihood. Daniels informed the agents that he did not know what Curtis did for a living. Daniels further stated that it was Curtis' "personal business" and that he "did not care to know." Daniels also stated that he was unaware of how much money Curtis earned. With respect to money, Daniels informed the agents that he received a few hundred dollars on behalf of Curtis in his Bank of America account. Daniels stated that this happened on one occasion. Daniels also stated that he did not know the reason why Curtis was receiving this money, and he did not know where the money was being sent from. Daniels also admitted to providing bail money for Curtis in a matter in New Jersey. In that case, Daniels stated that Curtis' license had been suspended due to someone in New Jersey using Curtis' name during a traffic stop.

Daniels also indicated that he had a conversation with Curtis regarding the removal of gun powder residue from Curtis' hands. Daniels stated that this conversation was a result of a television show Curtis was watching at the time — America's Most Wanted — and Curtis had a question regarding that matter.

8

During the course of the interview, Daniels also stated to the agents that, on occasion, he has driven Curtis' vehicles.  Namely, Daniels stated that he drove Curtis' red Dodge Challenger when it needed to be serviced at the dealership.  Daniels stated that he also had driven Curtis' gold Cadillac Escalade when he needed a bigger vehicle.  Further, Daniels informed the agents that Monique Curtis, Curtis' mother, had worked at a bank and had registered Curtis' vehicles in her name because of Curtis' bad credit rating.  With respect to Daniels' 2010 black Dodge Charger, Daniels informed agents that he had voluntarily returned this vehicle because he owed over $30,000.00 on it.  Daniels stated that he now drives a vehicle that he purchased with a $6,000 loan.

In addition, Daniels stated that he had never provided Curtis with any government property, including an NYPD parking plaque.  When asked by agents whether Daniels performed vehicle license plate searches in the police database for non-police business, Daniels informed the agents that he only ran vehicle license plate searches for vehicles registered to either Curtis or Curtis' mother, Monique.  All other searches were for official police business.  However, when confronted with evidence showing otherwise, namely a license plate not registered to either Curtis or Curtis' mother, Daniels stated that he performed this license plate search for Curtis.

9

According to Daniels, Curtis telephoned Daniels and advised him that this vehicle was blocking Curtis' driveway, and as a result of that telephone call, Daniels performed the license plate search for Curtis.

When asked by agents whether Daniels had searched the police database for warrants on individuals for non-police business or for warrants on Guy Curtis or on Guy Curtis' request, Daniels denied it.  Daniels stated that he never performed warrant and criminal history searches for non-police business.  Daniels also stated that he did not perform any database searches for an individual by the name of Rashon Carlos.  During the interview, the agents asked DANIELS questions concerning the reason for his appearance at the NYPD arrest scene of Ishamel Lambus, Curtis' co-defendant.  Daniels informed the agents that he showed up at Lambus' arrest scene for the purpose of finding out what was going on.  While at the location, Daniels was informed by NYPD Officers that Lambus had thrown something on the ground while attempting to flee. Daniels further informed the agents that he had to leave the area quickly because Daniels was running late for work, and that Curtis did not direct him to go to the arrest scene.  Following the interview, Daniels was taken to the United States District Court for the Eastern District of New York for arraignment.

10

A number of statements made by Daniels during the course of that interview were false.  Specifically, the indictment charges the following false statements:

- Daniels falsely stated and represented that the only vehicle license plates searched by him in the New York City Police Department's database for non-police business was for an individual known as Guy Curtis and the vehicle plates searched were for vehicles either owned by Guy Curtis or Guy Curtis' mother.  Daniels, in fact, performed vehicle license plates searches for Guy Curtis on vehicles owned by individuals other than Guy Curtis and his mother.

- Daniels falsely stated and represented that he only received a few hundred dollars on behalf of Guy Curtis in his Bank of America financial account, when, in fact, he had received thousands of dollars in his Bank of America account on behalf of Guy Curtis.

- Daniels falsely stated and represented that he never searched the New York City Police Department's database for warrants on individuals for non-police business nor did he ever search the New York City Police Department's database for warrants on Guy Curtis or on Guy Curtis' request.  Daniels, in fact, performed warrant searches on and for Guy Curtis on numerous occasions.

- Finally, Daniels falsely stated that (1) he was not directed by Guy Curtis to go to the arrest scene of Ishmael Lambus (Guy Curtis' co-defendant) on April 29, 2011, and that (2) he had to leave the area quickly because he was running late for work, when, in fact, as he knew, that Guy Curtis did direct him to go to the arrest scene and that he did not work that day.

## ARGUMENT

I.  Legal Standard

The Second Circuit repeatedly has held that "evidence of uncharged criminal conduct is not evidence of 'other crimes, wrongs or acts' under Federal Rule of Evidence 404(b) if that

11

conduct is "inextricably intertwined with the evidence regarding the charged offense." United States v. Quinones, 511 F.3d 289, 309 (2d Cir. 2007).  Where the uncharged crime evidence is necessary to "complete the story of the crime on trial," such evidence is "appropriately treated as part of the very act charged, or, at least, proof of that act."  Id. (internal quotations and citation omitted).  Courts have routinely admitted evidence that provides background of the crimes charged, completes the story of the crimes charged, or explains the nature of a relationship between defendants or co-conspirators.  United States v. Gonzalez, 110 F.3d 936, 941 (2d Cir. 1997) ("Background evidence may be admitted to show . . . the circumstances surrounding events or to furnish an explanation of the understanding or intent with which certain acts were performed.") (quoting United States v. Coonan, 938 F.2d 1553, 1561 (2d Cir. 1991)).  "One legitimate purpose for presenting extrinsic acts is to explain how a criminal relationship developed . . .  Such proof may also be used to help the jury understand the basis for the co-conspirators' relationship of mutual trust." United States v. Pipola, 83 F.3d 556, 566 (2d Cir. 1996) (citation omitted).  See also United States v. Rosa, 11 F.3d 315, 334 (2d Cir. 1993) (affirming admission of testimony that witness had prior criminal dealings

12

with the defendant for the purposes of explaining "how the illegal relationship between the two developed.")

Rule 404(b), in turn, only prohibits evidence of "crimes, wrongs or other acts" to the extent such evidence is offered "to prove a person's character . . . to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b). In other words, evidence of uncharged crimes is not admissible to prove one's propensity to commit crime in general. However, such evidence may be admissible to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. Id.

The Second Circuit adheres to an "inclusionary rule" regarding the admission of other act evidence. United States v. Inserra, 34 F.3d 83, 89 (2d. Cir. 1994). This rule allows the admission of such evidence "unless it is introduced for the sole purpose of showing the defendant's bad character or unless it is overly prejudicial . . . or not relevant[.]" United States v. Pascarella, 84 F.3d 61, 69 (2d Cir. 1996). The trial court has broad discretion to admit other act evidence under Rule 404(b), and its decision will not be reversed on appeal absent abuse of discretion. Inserra, 34 F.3d at 89.

Even if other act evidence is relevant and not offered to prove a person's general character to commit crime, the

13

inquiry does not end there.   The court must then consider whether the probative value of the prior act evidence is substantially outweighed by its prejudicial effect.   See Fed. R. Evid. 403; Huddleston v. United States, 485 U.S. 681, 691 (1988).

II.  Evidence Relating to Daniels' Relationship
     With Curtis is Admissible_____

          The government seeks to admit evidence relating to the personal relationship between Daniels and Curtis.   Specifically, the government seeks to introduce evidence that Daniels received loans from Curtis, borrowed Curtis' car, provided Curtis with an NYPD parking plaque, provided Curtis with a Police Benevolent Association card and miniature badge, and posted bail for Curtis.   In addition, the government seeks to introduce wire interceptions in which: (a) Curtis asks Daniels how to remove gunshot residue; (b) Daniels asks Curtis for a revolver; and (c) Curtis asks Daniels to "clap a felon."   Finally, the government seeks to introduce evidence relating to Curtis' request that Daniels investigate the arrest of Ishmael Lambus and provide his bank account information to allow Curtis to receive incoming wire transfers.   This evidence is admissible "other act" evidence because it demonstrates the relationship of mutual trust that led Daniels to commit crimes at Curtis' direction and explains the origins of Daniels' crimes.

14

Curtis is an uncharged co-conspirator who both induced and benefitted from Daniels' unauthorized access to the NYPD database.  Evidence regarding the relationship between Daniels and Curtis shows the background of the charged crimes and supports the government's other evidence, including wire interceptions of Daniels and Curtis communicating regarding the illegal searches, by showing Daniels' motive and demonstrating why he would trust Curtis with information he had obtained illegally.  Courts have routinely held that evidence that demonstrates the basis for a mutual relationship of trust between co-conspirators is admissible.  See Rosa, 11 F.3d at 334 ("We have held repeatedly that it is within the court's discretion to admit evidence of prior acts to . . . explain the mutual trust that existed between coconspirators."); Pipola, 83 F.3d at 566 (Proof of the background of a conspiracy "may also be used to help the jury understand the basis for the co-conspirator's relationship of mutual trust"); United States v. Alcaide, 112 F.3d 505, 1997 WL 225121, at *2 (2d Cir. 1997) ("[B]ackground information is routinely admitted to explain the origins of a conspiracy.").  Courts have also approved of the use of "other act" evidence to establish motive for the charged crimes.  For example, in United States v. Holmes, 421 Fed. Appx. 76, 79 (2d Cir. 2011), the Second Circuit found no abuse of discretion where the district court admitted evidence that the

15

defendant was involved in narcotics distribution because it established motive for the charged crime of possession of a firearm.  See also United States v. Davis, 181 F.3d 83, 1999 WL 316804, at *1 (2d Cir. 1992) (unpublished opinion) (holding that under Rule 404 "evidence of other acts is admissible" for "proof of motive" and "to show the background of . . . a relationship of trust.") (internal citations omitted).

III. Evidence Concerning Uncharged Computer
     Searches Is Admissible

     The government also seeks to introduce evidence concerning additional computer searches that Daniels performed (or directed others to perform) at Curtis' request.[1]  This evidence is relevant because it provides background to the charged crimes, completes the story of the charged crimes, and shows Daniels' motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

     For example, on or about September 25, 2008, Daniels received a text message from Curtis stating: "D what this Y. When u get a chance I need u took run my plate # to my galant n tell me if everything is clear.  DWW2352.  Good looking."  A few minutes later, Daniels responded: "Aite I got,,u im at work

---

[1] Daniels was not charged with these instances of accessing the NYPD database because these particular searches did not access NCIC, a federal database containing "information from any department or agency of the United States," within the meaning of 18 U.S.C. § 1030(a)(2)(B).

16

now." Approximately one hour later, Daniels texted Curtis:
"Yo,,,I checked its valid everything good." Curtis then
replied: "iight cool. No warrants. LOL."

As a threshold matter, the above text communication is
admissible because it consists of Daniels' own statements that
the government intends to use against him. Fed. R. Evid.
802(d)(2)(A). Curtis's portions of the text messages are
admissible as statements of an unindicted co-conspirator made in
furtherance of the conspiracy to misuse a computer. Fed. R.
Evid. 802(d)(2)(E). Evidence that Daniels actually ran the
search also is admissible, since it provides background to the
charged offenses and completes the story of the crimes on trial.
The September 29, 2008 search is the first recorded instance of
Daniels searching a database at Curtis' behest. Evidence that
Daniels performed the search is relevant in that it tends to
show that the charged instances of computer misuse were not
mistakes or accidents, that Daniels knew how to use the NYPD
database, and that he was willing to misuse the NYPD database.
The same reasoning applies to the additional uncharged NYPD
database searches that Daniels performed for Curtis or his
associates. See discussion supra at p. 6-7.

Thus, for the foregoing reasons, the government should
be permitted to introduce evidence of other instances where
Daniels ran NYPD database searches for Curtis.

17

IV.   The Probative Value of the Evidence
      Outweighs any Risk of Unfair Prejudice

          The probative value of the evidence relating to the
close relationship between Guy Curtis and Daniels and Daniels'
other unauthorized searches on the NYPD database outweighs any
risk of unfair prejudice; as a result, the admission of this
evidence does not violate Rule 403.   The probative value is
clear.   Evidence relating to the relationship between Daniels
and Guy Curtis explains the background of his crimes and his
motive to commit them.   That relationship makes sense of the
reasons that Daniels would risk his career to commit these
crimes.   Evidence relating to Daniels' other unauthorized use of
the NYPD database demonstrates that the charged crimes were not
errors, but rather part of a deliberate pattern of making
unauthorized queries in the NYPD database.

          The Second Circuit has repeatedly held that evidence
is not unfairly prejudicial when it is not "any more sensational
or disturbing than the crimes with which [the appellants were]
charged."   United States v. Pitre, 960 F.2d 1112, 1120 (2d Cir.
1992) (holding that in narcotics trial, district court properly
admitted evidence regarding prior narcotics transactions to show
defendant's intent and knowledge); see also United States v.
Williams, 205 F.3d 33-34 (2d Cir. 2000) (holding that evidence

18

is not unfairly prejudicial where it does "not involve conduct more serious than the charges crimes").  The proffered evidence in this case meets this standard.  The evidence that the government seeks to admit relates either to non-criminal acts — Daniels' relationship to Curtis — or criminal acts that are of precisely the same sort as those already charged, <u>i.e.</u>, Daniels' other unauthorized uses of the NYPD databases.  None of this evidence would "lure the fact finder into declaring guilty on a ground different from the proof specific to the offense charged."  <u>Old Chief v. United States</u>, 519 U.S. 172, 180 (1997).  As such, it should be admitted.

In any event, any risk of unfair prejudice could be effectively limited by a cautionary instruction limiting the jury's consideration of the evidence to the purposes for which it is offered.  <u>See, e.g.</u>, <u>United States v. Mickens</u>, 926 F.2d 1323, 1328-29 (2d Cir. 1991); <u>United States v. Levy</u>, 731 F.2d 997, 1002 (2d Cir. 1984).

## CONCLUSION

For the foregoing reasons, the Court should admit: (1) evidence relating to Daniels' relationship to Guy Curtis and (2) evidence relating to other occasions on which Daniels made unauthorized queries of the NYPD database.

Dated: Brooklyn, New York
        April 10, 2013


                        Respectfully submitted,

                        LORETTA E. LYNCH
                        United States Attorney
                        Eastern District of New York
                        271 Cadman Plaza East
                        Brooklyn, New York 11201


                   By:  _____/s/_____
                        Tyler J. Smith
                        Tiana A. Demas
                        Assistant U.S. Attorneys
                        (718) 254-6186/6116